# CLEVELAND BOARD OF EDUCATION *v.* LOUDERMILL ET AL.

No. 83–1362.   Argued December 3, 1984—Decided March 19, 1985*

*Together with No. 83–1363, *Parma Board of Education* v. *Donnelly et al.*, and No. 83–6392, *Loudermill* v. *Cleveland Board of Education et al.*, also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, STEVENS, and O'CONNOR, JJ., joined, in Parts I, II, III, and IV of which BRENNAN, J., joined, and in Part II of which MARSHALL, J., joined. MARSHALL, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 548. BRENNAN, J., filed an opinion concurring in part and dissenting in part, *post*, p. 551. REHNQUIST, J., filed a dissenting opinion, *post*, p. 559.

*James G. Wyman* argued the cause for petitioners in Nos. 83–1362 and 83–1363 and respondents in No. 83–6392. With him on the brief for petitioner in No. 83–1362 was *Thomas C. Simiele.* *John F. Lewis* and *John T. Meredith* filed a brief for petitioner in No. 83–1363. *John D. Maddox* and *Stuart A. Freidman* filed a brief for respondents Cleveland Civil Service Commission et al. in No. 83–6392.

*Robert M. Fertel*, by appointment of the Court, 468 U. S. 1203, argued the cause and filed briefs for respondents in Nos. 83–1362 and 83–1363 and petitioner in No. 83–6392.†

†Briefs of *amici curiae* urging reversal in Nos. 83–1362 and 83–1363 were filed for the State of Ohio et al. by *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Gene W. Holliker* and *Christine Manuelian*, Assistant Attorneys General, *Charles A. Graddick*, Attorney General of Alabama, *Robert K. Corbin*, Attorney General of Arizona, *Tany S. Hong*, Attorney General of Hawaii, *Lindley E. Pearson*, Attorney General of Indiana, *Robert T. Stephen*, Attorney General of Kansas, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *William A. Allain*, Attorney General of Mississippi, *Michael T. Greely*, Attorney General of Montana, *Brian McKay*, Attorney General of Nevada, *Gregory H. Smith*, Attorney General of New Hampshire, *Irwin I. Kimmelman*, Attorney General of New Jersey, *Robert WeFald*, Attorney General of North Dakota, *Michael Turpen*, Attorney General of Oklahoma, *David Frohnmayer*, Attorney General of Oregon, *LeRoy S. Zimmerman*, Attorney General of Pennsylvania, *Mark V. Meierhenry*, Attorney General of South Dakota, *Bronson C. La Follette*, Attorney General of Wisconsin, and *Archie G. McClintock*, Attorney

JUSTICE WHITE delivered the opinion of the Court.

In these cases we consider what pretermination process must be accorded a public employee who can be discharged only for cause.

I

In 1979 the Cleveland Board of Education, petitioner in No. 83–1362, hired respondent James Loudermill as a security guard. On his job application, Loudermill stated that he had never been convicted of a felony. Eleven months later, as part of a routine examination of his employment records, the Board discovered that in fact Loudermill had been convicted of grand larceny in 1968. By letter dated November 3, 1980, the Board's Business Manager informed Loudermill that he had been dismissed because of his dishonesty in filling out the employment application. Loudermill was not afforded an opportunity to respond to the charge of dishonesty or to challenge his dismissal. On November 13, the Board adopted a resolution officially approving the discharge.

Under Ohio law, Loudermill was a "classified civil servant." Ohio Rev. Code Ann. § 124.11 (1984). Such employees can be terminated only for cause, and may obtain administrative review if discharged. § 124.34. Pursuant to this provision, Loudermill filed an appeal with the Cleveland Civil Service Commission on November 12. The Commission appointed a referee, who held a hearing on January 29, 1981. Loudermill argued that he had thought that his 1968 larceny conviction was for a misdemeanor rather than a felony. The referee recommended reinstatement. On July 20, 1981, the

General of Wyoming; and for the National School Boards Association by *Gwendolyn H. Gregory* and *August W. Steinhilber.*

Briefs of *amici curiae* urging affirmance in Nos. 83–1362 and 83–1363 were filed for the American Civil Liberties Union of Cleveland Foundation by *Gordon J. Beggs, Edward R. Stege, Jr.,* and *Charles S. Sims;* for the American Federation of State, County, and Municipal Employees, AFL–CIO, by *Richard Kirschner;* and for the National Educational Association by *Robert H. Chanin* and *Michael H. Gottesman.*

full Commission heard argument and orally announced that it would uphold the dismissal. Proposed findings of fact and conclusions of law followed on August 10, and Loudermill's attorneys were advised of the result by mail on August 21.

Although the Commission's decision was subject to judicial review in the state courts, Loudermill instead brought the present suit in the Federal District Court for the Northern District of Ohio. The complaint alleged that § 124.34 was unconstitutional on its face because it did not provide the employee an opportunity to respond to the charges against him prior to removal. As a result, discharged employees were deprived of liberty and property without due process. The complaint also alleged that the provision was unconstitutional as applied because discharged employees were not given sufficiently prompt postremoval hearings.

Before a responsive pleading was filed, the District Court dismissed for failure to state a claim on which relief could be granted. See Fed. Rule Civ. Proc. 12(b)(6). It held that because the very statute that created the property right in continued employment also specified the procedures for discharge, and because those procedures were followed, Loudermill was, by definition, afforded all the process due. The post-termination hearing also adequately protected Loudermill's liberty interests. Finally, the District Court concluded that, in light of the Commission's crowded docket, the delay in processing Loudermill's administrative appeal was constitutionally acceptable. App. to Pet. for Cert. in No. 83–1362, pp. A36–A42.

The other case before us arises on similar facts and followed a similar course. Respondent Richard Donnelly was a bus mechanic for the Parma Board of Education. In August 1977, Donnelly was fired because he had failed an eye examination. He was offered a chance to retake the examination but did not do so. Like Loudermill, Donnelly appealed to the Civil Service Commission. After a year of wrangling about the timeliness of his appeal, the Commission heard

the case. It ordered Donnelly reinstated, though without backpay.[1] In a complaint essentially identical to Loudermill's, Donnelly challenged the constitutionality of the dismissal procedures. The District Court dismissed for failure to state a claim, relying on its opinion in *Loudermill*.

The District Court denied a joint motion to alter or amend its judgment,[2] and the cases were consolidated for appeal. A divided panel of the Court of Appeals for the Sixth Circuit reversed in part and remanded. 721 F. 2d 550 (1983). After rejecting arguments that the actions were barred by failure to exhaust administrative remedies and by res judicata—arguments that are not renewed here—the Court of Appeals found that both respondents had been deprived of due process. It disagreed with the District Court's original rationale. Instead, it concluded that the compelling private interest in retaining employment, combined with the value of presenting evidence prior to dismissal, outweighed the added administrative burden of a pretermination hearing. *Id.*, at 561–562. With regard to the alleged deprivation of liberty, and Loudermill's 9-month wait for an administrative decision, the court affirmed the District Court, finding no constitutional violation. *Id.*, at 563–564.

---

[1] The statute authorizes the Commission to "affirm, disaffirm, or modify the judgment of the appointing authority." Ohio Rev. Code Ann. § 124.34 (1984). Petitioner Parma Board of Education interprets this as authority to reinstate with or without backpay and views the Commission's decision as a compromise. Brief for Petitioner in No. 83–1363, p. 6, n. 3; Tr. of Oral. Arg. 14. The Court of Appeals, however, stated that the Commission lacked the power to award backpay. 721 F. 2d 550, 554, n. 3 (1983). As the decision of the Commission is not in the record, we are unable to determine the reasoning behind it.

[2] In denying the motion, the District Court no longer relied on the principle that the state legislature could define the necessary procedures in the course of creating the property right. Instead, it reached the same result under a balancing test based on JUSTICE POWELL's concurring opinion in *Arnett* v. *Kennedy*, 416 U. S. 134, 168–169 (1974), and the Court's opinion in *Mathews* v. *Eldridge*, 424 U. S. 319 (1976). App. to Pet. for Cert. in No. 83–1362, pp. A54–A57.

The dissenting judge argued that respondents' property interests were conditioned by the procedural limitations accompanying the grant thereof. He considered constitutional requirements satisfied because there was a reliable pretermination finding of "cause," coupled with a due process hearing at a meaningful time and in a meaningful manner. *Id.*, at 566.

Both employers petitioned for certiorari. Nos. 83–1362 and 83–1363. In a cross-petition, Loudermill sought review of the rulings adverse to him. No. 83–6392. We granted all three petitions, 467 U. S. 1204 (1984), and now affirm in all respects.

## II

Respondents' federal constitutional claim depends on their having had a property right in continued employment.[3] *Board of Regents* v. *Roth*, 408 U. S. 564, 576–578 (1972); *Reagan* v. *United States*, 182 U. S. 419, 425 (1901). If they did, the State could not deprive them of this property without due process. See *Memphis Light, Gas & Water Div.* v. *Craft*, 436 U. S. 1, 11–12 (1978); *Goss* v. *Lopez*, 419 U. S. 565, 573–574 (1975).

Property interests are not created by the Constitution, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Board of Regents* v. *Roth, supra*, at 577. See also *Paul* v. *Davis*, 424 U. S. 693, 709 (1976). The Ohio statute plainly creates such an interest. Respondents were "classified civil service employees," Ohio Rev. Code Ann. § 124.11 (1984), entitled to retain their positions "during good behavior and efficient service," who could not be dismissed "except . . . for . . . misfeasance,

---

[3] Of course, the Due Process Clause also protects interests of life and liberty. The Court of Appeals' finding of a constitutional violation was based solely on the deprivation of a property interest. We address below Loudermill's contention that he has been unconstitutionally deprived of liberty. See n. 13, *infra*.

malfeasance, or nonfeasance in office," § 124.34.[4]   The stat-
ute plainly supports the conclusion, reached by both lower
courts, that respondents possessed property rights in con-
tinued employment.   Indeed, this question does not seem to
have been disputed below.[5]

The Parma Board argues, however, that the property right
is defined by, and conditioned on, the legislature's choice
of procedures for its deprivation.   Brief for Petitioner in
No. 83–1363, pp. 26–27.   The Board stresses that in addition
to specifying the grounds for termination, the statute sets
out procedures by which termination may take place.[6]   The

---

[4] The relevant portion of § 124.34 provides that no classified civil serv-
ant may be removed except "for incompetency, inefficiency, dishonesty,
drunkenness, immoral conduct, insubordination, discourteous treatment of
the public, neglect of duty, violation of such sections or the rules of the
director of administrative services or the commission, or any other failure
of good behavior, or any other acts of misfeasance, malfeasance, or non-
feasance in office."

[5] The Cleveland Board of Education now asserts that Loudermill had no
property right under state law because he obtained his employment by
lying on the application.   It argues that had Loudermill answered truth-
fully he would not have been hired.   He therefore lacked a "legitimate
claim of entitlement" to the position.   Brief for Petitioner in No. 83–1362,
pp. 14–15.

For several reasons, we must reject this submission.   First, it was not
raised below.   Second, it makes factual assumptions—that Loudermill lied,
and that he would not have been hired had he not done so—that are incon-
sistent with the allegations of the complaint and inappropriate at this stage
of the litigation, which has not proceeded past the initial pleadings stage.
Finally, the argument relies on a retrospective fiction inconsistent with the
undisputed fact that Loudermill was hired and did hold the security guard
job.   The Board cannot escape its constitutional obligations by rephrasing
the basis for termination as a reason why Loudermill should not have been
hired in the first place.

[6] After providing for dismissal only for cause, see n. 4, *supra*, § 124.34
states that the dismissed employee is to be provided with a copy of the
order of removal giving the reasons therefor.   Within 10 days of the filing
of the order with the Director of Administrative Services, the employee
may file a written appeal with the State Personnel Board of Review or the
Commission.   "In the event such an appeal is filed, the board or commis-

procedures were adhered to in these cases. According to petitioner, "[t]o require additional procedures would in effect expand the scope of the property interest itself." *Id.*, at 27. See also Brief for State of Ohio et al. as *Amici Curiae* 5–10.

This argument, which was accepted by the District Court, has its genesis in the plurality opinion in *Arnett* v. *Kennedy*, 416 U. S. 134 (1974). *Arnett* involved a challenge by a former federal employee to the procedures by which he was dismissed. The plurality reasoned that where the legislation conferring the substantive right also sets out the procedural mechanism for enforcing that right, the two cannot be separated:

> "The employee's statutorily defined right is not a guarantee against removal without cause in the abstract, but such a guarantee as enforced by the procedures which Congress has designated for the determination of cause.
>
> .     .     .     .     .     .
>
> "[W]here the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a litigant in the position of appellee must take the bitter with the sweet." *Id.*, at 152–154.

This view garnered three votes in *Arnett*, but was specifically rejected by the other six Justices. See *id.*, at 166–167 (POWELL, J., joined by BLACKMUN, J.,); *id.*, at 177–178, 185 (WHITE, J.,); *id.*, at 211 (MARSHALL, J., joined by Douglas and BRENNAN, JJ.). Since then, this theory has at times seemed to gather some additional support. See *Bishop* v. *Wood*, 426 U. S. 341, 355–361 (1976) (WHITE, J., dissenting); *Goss* v. *Lopez*, 419 U. S., at 586–587 (POWELL, J., joined

---

sion shall forthwith notify the appointing authority and shall hear, or appoint a trial board to hear, such appeal within thirty days from and after its filing with the board or commission, and it may affirm, disaffirm, or modify the judgment of the appointing authority." Either side may obtain review of the Commission's decision in the State Court of Common Pleas.

by BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., dissenting). More recently, however, the Court has clearly rejected it. In *Vitek* v. *Jones*, 445 U. S. 480, 491 (1980), we pointed out that "minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action." This conclusion was reiterated in *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422, 432 (1982), where we reversed the lower court's holding that because the entitlement arose from a state statute, the legislature had the prerogative to define the procedures to be followed to protect that entitlement.

In light of these holdings, it is settled that the "bitter with the sweet" approach misconceives the constitutional guarantee. If a clearer holding is needed, we provide it today. The point is straightforward: the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Arnett* v. *Kennedy, supra,* at 167 (POWELL, J., concurring in part and concurring in result in part); see *id.,* at 185 (WHITE, J., concurring in part and dissenting in part).

In short, once it is determined that the Due Process Clause applies, "the question remains what process is due." *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972). The answer to that question is not to be found in the Ohio statute.

## III

An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 313 (1950). We have described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."[7] *Boddie* v. *Connecticut*, 401 U. S. 371, 379 (1971) (emphasis in original); see *Bell* v. *Burson*, 402 U. S. 535, 542 (1971). This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. *Board of Regents* v. *Roth*, 408 U. S., at 569–570; *Perry* v. *Sindermann*, 408 U. S. 593, 599 (1972). As we pointed out last Term, this rule has been settled for some time now. *Davis* v. *Scherer*, 468 U. S. 183, 192, n. 10 (1984); *id.*, at 200–203 (BRENNAN, J., concurring in part and dissenting in part). Even decisions finding no constitutional violation in termination procedures have relied on the existence of some pretermination opportunity to respond. For example, in *Arnett* six Justices found constitutional minima satisfied where the employee had access to the material upon which the charge was based and could respond orally and in writing and present rebuttal affidavits. See also *Barry* v. *Barchi*, 443 U. S. 55, 65 (1979) (no due process violation where horse trainer whose license was suspended "was given more than one opportunity to present his side of the story").

The need for some form of pretermination hearing, recognized in these cases, is evident from a balancing of the competing interests at stake. These are the private interest in

---

[7] There are, of course, some situations in which a postdeprivation hearing will satisfy due process requirements. See *Ewing* v. *Mytinger & Casselberry, Inc.*, 339 U. S. 594 (1950); *North American Cold Storage Co.* v. *Chicago*, 211 U. S. 306 (1908).

retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination. See *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976).

First, the significance of the private interest in retaining employment cannot be gainsaid. We have frequently recognized the severity of depriving a person of the means of livelihood. See *Fusari* v. *Steinberg,* 419 U. S. 379, 389 (1975); *Bell* v. *Burson, supra,* at 539; *Goldberg* v. *Kelly,* 397 U. S. 254, 264 (1970); *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337, 340 (1969). While a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job. See *Lefkowitz* v. *Turley,* 414 U. S. 70, 83–84 (1973).

Second, some opportunity for the employee to present his side of the case is recurringly of obvious value in reaching an accurate decision. Dismissals for cause will often involve factual disputes. Cf. *Califano* v. *Yamasaki,* 442 U. S. 682, 686 (1979). Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect. See *Goss* v. *Lopez,* 419 U. S., at 583–584; *Gagnon* v. *Scarpelli,* 411 U. S. 778, 784–786 (1973).[8]

---

[8] This is not to say that where state conduct is entirely discretionary the Due Process Clause is brought into play. See *Meachum* v. *Fano,* 427 U. S. 215, 228 (1976). Nor is it to say that a person can insist on a hearing in order to argue that the decisionmaker should be lenient and depart from legal requirements. See *Dixon* v. *Love,* 431 U. S. 105, 114 (1977). The point is that where there is an entitlement, a prior hearing facilitates the consideration of whether a permissible course of action is also an appropriate one. This is one way in which providing "effective notice and informal hearing permitting the [employee] to give his version of the events will provide a meaningful hedge against erroneous action. At least the [employer] will be alerted to the existence of disputes about facts and

The cases before us illustrate these considerations. Both respondents had plausible arguments to make that might have prevented their discharge. The fact that the Commission saw fit to reinstate Donnelly suggests that an error might have been avoided had he been provided an opportunity to make his case to the Board. As for Loudermill, given the Commission's ruling we cannot say that the discharge was mistaken. Nonetheless, in light of the referee's recommendation, neither can we say that a fully informed decisionmaker might not have exercised its discretion and decided not to dismiss him, notwithstanding its authority to do so. In any event, the termination involved arguable issues,[9] and the right to a hearing does not depend on a demonstration of certain success. *Carey* v. *Piphus*, 435 U. S. 247, 266 (1978).

The governmental interest in immediate termination does not outweigh these interests. As we shall explain, affording the employee an opportunity to respond prior to termination would impose neither a significant administrative burden nor intolerable delays. Furthermore, the employer shares the employee's interest in avoiding disruption and erroneous decisions; and until the matter is settled, the employer would continue to receive the benefit of the employee's labors. It is preferable to keep a qualified employee on than to train a new one. A governmental employer also has an interest in keeping citizens usefully employed rather than taking the possibly erroneous and counterproductive step of forcing its employees onto the welfare rolls. Finally, in those situations where the employer perceives a significant hazard in

---

arguments about cause and effect. . . . [H]is discretion will be more informed and we think the risk of error substantially reduced." *Goss* v. *Lopez*, 419 U. S., at 583–584.

[9] Loudermill's dismissal turned not on the objective fact that he was an ex-felon or the inaccuracy of his statement to the contrary, but on the subjective question whether he had lied on his application form. His explanation for the false statement is plausible in light of the fact that he received only a suspended 6-month sentence and a fine on the grand larceny conviction. Tr. of Oral Arg. 35.

keeping the employee on the job,[10] it can avoid the problem by suspending with pay.

## IV

The foregoing considerations indicate that the pretermination "hearing," though necessary, need not be elaborate. We have pointed out that "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Boddie* v. *Connecticut*, 401 U. S., at 378. See *Cafeteria Workers* v. *McElroy*, 367 U. S. 886, 894–895 (1961). In general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action. *Mathews* v. *Eldridge*, 424 U. S., at 343. Under state law, respondents were later entitled to a full administrative hearing and judicial review. The only question is what steps were required before the termination took effect.

In only one case, *Goldberg* v. *Kelly*, 397 U. S. 254 (1970), has the Court required a full adversarial evidentiary hearing prior to adverse governmental action. However, as the *Goldberg* Court itself pointed out, see *id.*, at 264, that case presented significantly different considerations than are present in the context of public employment. Here, the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether

---

[10] In the cases before us, no such danger seems to have existed. The examination Donnelly failed was related to driving school buses, not repairing them. *Id.*, at 39–40. As the Court of Appeals stated, "[n]o emergency was even conceivable with respect to Donnelly." 721 F. 2d, at 562. As for Loudermill, petitioner states that "to find that we have a person who is an ex-felon as our security guard is very distressful to us." Tr. of Oral Arg. 19. But the termination was based on the presumed misrepresentation on the employment form, not on the felony conviction. In fact, Ohio law provides that an employee "shall not be disciplined for acts," including criminal convictions, occurring more than two years previously. See Ohio Admin. Code § 124–3–04 (1979). Petitioner concedes that Loudermill's job performance was fully satisfactory.

there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. See *Bell* v. *Burson,* 402 U. S., at 540.

The essential requirements of due process, and all that respondents seek or the Court of Appeals required, are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. See Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1281 (1975). The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. See *Arnett* v. *Kennedy,* 416 U. S., at 170–171 (opinion of POWELL, J.); *id.,* at 195–196 (opinion of WHITE, J.); see also *Goss* v. *Lopez,* 419 U. S., at 581. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

## V

Our holding rests in part on the provisions in Ohio law for a full post-termination hearing. In his cross-petition Loudermill asserts, as a separate constitutional violation, that his administrative proceedings took too long.[11] The Court of

---

[11] Loudermill's hearing before the referee occurred two and one-half months after he filed his appeal. The Commission issued its written decision six and one-half months after that. Administrative proceedings in Donnelly's case, once it was determined that they could proceed at all, were swifter. A writ of mandamus requiring the Commission to hold a hearing was issued on May 9, 1978; the hearing took place on May 30; the order of reinstatement was issued on July 6.

Section 124.34 provides that a hearing is to be held within 30 days of the appeal, though the Ohio courts have ruled that the time limit is not mandatory. *E. g., In re Bronkar,* 53 Ohio Misc. 13, 17, 372 N. E. 2d 1345, 1347 (Com. Pl. 1977). The statute does not provide a time limit for the actual decision.

Appeals held otherwise, and we agree.[12]   The Due Process Clause requires provision of a hearing "at a meaningful time."   *E. g.*, *Armstrong* v. *Manzo*, 380 U. S. 545, 552 (1965).   At some point, a delay in the post-termination hearing would become a constitutional violation.   See *Barry* v. *Barchi*, 443 U. S., at 66.   In the present case, however, the complaint merely recites the course of proceedings and concludes that the denial of a "speedy resolution" violated due process.   App. 10.   This reveals nothing about the delay except that it stemmed in part from the thoroughness of the procedures.   A 9-month adjudication is not, of course, unconstitutionally lengthy *per se*.   Yet Loudermill offers no indication that his wait was unreasonably prolonged other than the fact that it took nine months.   The chronology of the proceedings set out in the complaint, coupled with the assertion that nine months is too long to wait, does not state a claim of a constitutional deprivation.[13]

## VI

We conclude that all the process that is due is provided by a pretermination opportunity to respond, coupled with post-

---

[12] It might be argued that once we find a due process violation in the denial of a pretermination hearing we need not and should not consider whether the post-termination procedures were adequate.   See *Barry* v. *Barchi*, 443 U. S. 55, 72–74 (1979) (BRENNAN, J., concurring in part).   We conclude that it is appropriate to consider this issue, however, for three reasons.   First, the allegation of a distinct due process violation in the administrative delay is not an alternative theory supporting the same relief, but a separate claim altogether.   Second, it was decided by the court below and is raised in the cross-petition.   Finally, the existence of post-termination procedures is relevant to the necessary scope of pretermination procedures.

[13] The cross-petition also argues that Loudermill was unconstitutionally deprived of liberty because of the accusation of dishonesty that hung over his head during the administrative proceedings.   As the Court of Appeals found, 721 F. 2d, at 563, n. 18, the failure to allege that the reasons for the dismissal were published dooms this claim.   See *Bishop* v. *Wood*, 426 U. S. 341, 348 (1976).

termination administrative procedures as provided by the Ohio statute. Because respondents allege in their complaints that they had no chance to respond, the District Court erred in dismissing for failure to state a claim. The judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE MARSHALL, concurring in part and concurring in the judgment.

I agree wholeheartedly with the Court's express rejection of the theory of due process, urged upon us by the petitioner Boards of Education, that a public employee who may be discharged only for cause may be discharged by whatever procedures the legislature chooses. I therefore join Part II of the opinion for the Court. I also agree that, before discharge, the respondent employees were entitled to the opportunity to respond to the charges against them (which is all they requested), and that the failure to accord them that opportunity was a violation of their constitutional rights. Because the Court holds that the respondents were due all the process they requested, I concur in the judgment of the Court.

I write separately, however, to reaffirm my belief that public employees who may be discharged only for cause are entitled, under the Due Process Clause of the Fourteenth Amendment, to more than respondents sought in this case. I continue to believe that *before the decision is made to terminate an employee's wages*, the employee is entitled to an opportunity to test the strength of the evidence "by confronting and cross-examining adverse witnesses and by presenting witnesses on his own behalf, whenever there are substantial disputes in testimonial evidence," *Arnett* v. *Kennedy,* 416 U. S. 134, 214 (1974) (MARSHALL, J., dissenting). Because the Court suggests that even in this situation due process requires no more than notice and an opportunity to be heard before wages are cut off, I am not able to join the Court's opinion in its entirety.

To my mind, the disruption caused by a loss of wages may be so devastating to an employee that, whenever there are substantial disputes about the evidence, additional predeprivation procedures are necessary to minimize the risk of an erroneous termination. That is, I place significantly greater weight than does the Court on the public employee's substantial interest in the accuracy of the pretermination proceeding. After wage termination, the employee often must wait months before his case is finally resolved, during which time he is without wages from his public employment. By limiting the procedures due prior to termination of wages, the Court accepts an impermissibly high risk that a wrongfully discharged employee will be subjected to this often lengthy wait for vindication, and to the attendant and often traumatic disruptions to his personal and economic life.

Considerable amounts of time may pass between the termination of wages and the decision in a post-termination evidentiary hearing—indeed, in this case nine months passed before Loudermill received a decision from his postdeprivation hearing. During this period the employee is left in limbo, deprived of his livelihood and of wages on which he may well depend for basic sustenance. In that time, his ability to secure another job might be hindered, either because of the nature of the charges against him, or because of the prospect that he will return to his prior public employment if permitted. Similarly, his access to unemployment benefits might seriously be constrained, because many States deny unemployment compensation to workers discharged for cause.* Absent an interim source of wages, the employee might be unable to meet his basic, fixed costs, such as food, rent or mortgage payments. He would be forced to spend his savings, if he had any, and to convert his possessions to

---

*See U. S. Dept. of Labor, Comparison of State Unemployment Insurance Laws §§ 425, 435 (1984); see also *id.*, at 4–33 to 4–36 (table of state rules governing disqualification from benefits for discharge for misconduct).

cash before becoming eligible for public assistance. Even in that instance

"[t]he substitution of a meager welfare grant for a regular paycheck may bring with it painful and irremediable personal as well as financial dislocations. A child's education may be interrupted, a family's home lost, a person's relationship with his friends and even his family may be irrevocably affected. The costs of being forced, even temporarily, onto the welfare rolls because of a wrongful discharge from tenured Government employment cannot be so easily discounted," *id.*, at 221.

Moreover, it is in no respect certain that a prompt postdeprivation hearing will make the employee economically whole again, and the wrongfully discharged employee will almost inevitably suffer irreparable injury. Even if reinstatement is forthcoming, the same might not be true of backpay—as it was not to respondent Donnelly in this case—and the delay in receipt of wages would thereby be transformed into a permanent deprivation. Of perhaps equal concern, the personal trauma experienced during the long months in which the employee awaits decision, during which he suffers doubt, humiliation, and the loss of an opportunity to perform work, will never be recompensed, and indeed probably could not be with dollars alone.

That these disruptions might fall upon a justifiably discharged employee is unfortunate; that they might fall upon a wrongfully discharged employee is simply unacceptable. Yet in requiring only that the employee have an opportunity to respond before his wages are cut off, without affording him any meaningful chance to present a defense, the Court is willing to accept an impermissibly high risk of error with respect to a deprivation that is substantial.

Were there any guarantee that the postdeprivation hearing and ruling would occur promptly, such as within a few days of the termination of wages, then this minimal pre-

deprivation process might suffice. But there is no such guarantee. On a practical level, if the employer had to pay the employee until the end of the proceeding, the employer obviously would have an incentive to resolve the issue expeditiously. The employer loses this incentive if the only suffering as a result of the delay is borne by the wage earner, who eagerly awaits the decision on his livelihood. Nor has this Court grounded any guarantee of this kind in the Constitution. Indeed, this Court has in the past approved, at least implicitly, an average 10- or 11-month delay in the receipt of a decision on Social Security benefits, *Mathews* v. *Eldridge*, 424 U. S. 319, 341–342 (1976), and, in the case of respondent Loudermill, the Court gives a stamp of approval to a process that took nine months. The hardship inevitably increases as the days go by, but nevertheless the Court countenances such delay. The adequacy of the predeprivation and postdeprivation procedures are inevitably intertwined, and only a constitutional guarantee that the latter will be immediate and complete might alleviate my concern about the possibility of a wrongful termination of wages.

The opinion for the Court does not confront this reality. I cannot and will not close my eyes today—as I could not 10 years ago—to the economic situation of great numbers of public employees, and to the potentially traumatic effect of a wrongful discharge on a working person. Given that so very much is at stake, I am unable to accept the Court's narrow view of the process due to a public employee before his wages are terminated, and before he begins the long wait for a public agency to issue a final decision in his case.

JUSTICE BRENNAN, concurring in part and dissenting in part.

Today the Court puts to rest any remaining debate over whether public employers must provide meaningful notice and hearing procedures before discharging an employee for

cause. As the Court convincingly demonstrates, the employee's right to fair notice and an opportunity to "present his side of the story" before discharge is not a matter of legislative grace, but of "constitutional guarantee." *Ante*, at 541, 546. This principle, reaffirmed by the Court today, has been clearly discernible in our "repeated pronouncements" for many years. See *Davis* v. *Scherer*, 468 U. S. 183, 203 (1984) (BRENNAN, J., concurring in part and dissenting in part).

Accordingly, I concur in Parts I–IV of the Court's opinion. I write separately to comment on two issues the Court does not resolve today, and to explain my dissent from the result in Part V of the Court's opinion.

## I

First, the Court today does not prescribe the precise form of required pretermination procedures in cases where an employee disputes the *facts* proffered to support his discharge. The cases at hand involve, as the Court recognizes, employees who did not dispute the facts but had "plausible arguments to make that might have prevented their discharge." *Ante*, at 544. In such cases, notice and an "opportunity to present reasons," *ante*, at 546, are sufficient to protect the important interests at stake.

As the Court also correctly notes, other cases "will often involve factual disputes," *ante*, at 543, such as allegedly erroneous records or false accusations. As JUSTICE MARSHALL has previously noted and stresses again today, *ante*, at 548, where there exist not just plausible arguments to be made, but also "substantial disputes in testimonial evidence," due process may well require more than a simple opportunity to argue or deny. *Arnett* v. *Kennedy*, 416 U. S. 134, 214 (1974) (MARSHALL, J., dissenting). The Court acknowledges that what the Constitution requires prior to discharge, in general terms, is pretermination procedures sufficient to provide "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe

that the charges against the employee are *true* and support the proposed action." *Ante,* at 545–546 (emphasis added). When factual disputes are involved, therefore, an employee may deserve a fair opportunity before discharge to produce contrary records or testimony, or even to confront an accuser in front of the decisionmaker. Such an opportunity might not necessitate "elaborate" procedures, see *ante,* at 545, but the fact remains that in some cases only such an oppportunity to challenge the source or produce contrary evidence will suffice to support a finding that there are "reasonable grounds" to believe accusations are "true."

Factual disputes are not involved in these cases, however, and the "very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895 (1961). I do not understand Part IV to foreclose the views expressed above or by JUSTICE MARSHALL, *ante,* p. 548, with respect to discharges based on disputed evidence or testimony. I therefore join Parts I–IV of the Court's opinion.

II

The second issue not resolved today is that of administrative delay. In holding that Loudermill's administrative proceedings did not take too long, the Court plainly does *not* state a flat rule that 9-month delays in deciding discharge appeals will pass constitutional scrutiny as a matter of course. To the contrary, the Court notes that a full post-termination hearing and decision must be provided at "a meaningful time" and that "[a]t some point, a delay in the post-termination hearing would become a constitutional violation." *Ante,* at 547. For example, in *Barry* v. *Barchi,* 443 U. S. 55 (1979), we disapproved as "constitutionally infirm" the shorter administrative delays that resulted under a statute that required "prompt" postsuspension hearings for suspended racehorse trainers with decision to follow within 30 days of the hearing. *Id.,* at 61, 66. As JUSTICE MARSHALL demonstrates, when an employee's wages are terminated pending

administrative decision, "hardship inevitably increases as the days go by." *Ante,* at 551; see also *Arnett* v. *Kennedy, supra,* at 194 (WHITE, J., concurring in part and dissenting in part) ("The impact on the employee of being without a job pending a full hearing is likely to be considerable because '[m]ore than 75 percent of actions contested within employing agencies require longer to decide than the 60 days required by . . . regulations'") (citation omitted). In such cases the Constitution itself draws a line, as the Court declares, "at some point" beyond which the State may not continue a deprivation absent decision.[1] The holding in Part V is merely that, in this particular case, Loudermill failed to allege facts sufficient to state a cause of action, and not that nine months can never exceed constitutional limits.

### III

Recognizing the limited scope of the holding in Part V, I must still dissent from its result, because the record in this case is insufficiently developed to permit an informed judgment on the issue of overlong delay. Loudermill's complaint was dismissed without answer from the respondent Cleveland Civil Service Commission. Allegations at this early stage are to be liberally construed, and "[i]t is axiomatic that a complaint should not be dimissed unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *McLain* v. *Real Estate Bd. of New Orleans, Inc.,* 444 U. S. 232, 246 (1980) (citation omitted). Loudermill alleged that it took the Commission over two and one-half months simply to hold

---

[1] Post-termination administrative procedures designed to determine fully and accurately the correctness of discharge actions are to be encouraged. Multiple layers of administrative procedure, however, may not be created merely to smother a discharged employee with "thoroughness," effectively destroying his constitutionally protected interests by over-extension. Cf. *ante,* at 547 ("thoroughness" of procedures partially explains delay in this case).

a hearing in his case, over two months *more* to issue a nonbinding interim decision, and more than three and one-half months after *that* to deliver a final decision. Complaint ¶¶ 20, 21, App. 10.[2] The Commission provided no explanation for these significant gaps in the administrative process; we do not know if they were due to an overabundance of appeals, Loudermill's own foot-dragging, bad faith on the part of the Commission, or any other of a variety of reasons that might affect our analysis. We do know, however, that under Ohio law the Commission is obligated to hear appeals like Loudermill's "within thirty days." Ohio Rev. Code Ann. § 124.34 (1984).[3] Although this statutory limit has been

---

[2] The interim decision, issued by a hearing examiner, was in Loudermill's favor and recommended his reinstatement. But Loudermill was not reinstated nor were his wages even temporarily restored; in fact, there apparently exists no provision for such interim relief or restoration of backpay under Ohio's statutory scheme. See *ante*, at 537, n. 1; cf. *Arnett* v. *Kennedy*, 416 U. S. 134, 196 (1974) (WHITE, J., concurring in part and dissenting in part) (under federal civil service law, discharged employee's wages are only "provisionally cut off" pending appeal); *id.*, at 146 (opinion of REHNQUIST, J.) (under federal system, backpay is automatically refunded "if the [discharged] employee is reinstated on appeal"). See also N. Y. Civ. Serv. Law § 75(3) (McKinney 1983) (suspension without pay pending determination of removal charges may not exceed 30 days). Moreover, the final decision of the Commission to reverse the hearing examiner apparently was arrived at without any additional evidentiary development; only further argument was had before the Commission. 721 F. 2d 550, 553 (CA6 1983). These undisputed facts lead me at least to question the administrative value of, and justification for, the 9-month period it took to decide Loudermill's case.

[3] A number of other States similarly have specified time limits for hearings and decisions on discharge appeals taken by tenured public employees, indicating legislative consensus that a month or two normally is sufficient time to resolve such actions. No state statutes permit administrative delays of the length alleged by Loudermill. See, *e. g.*, Ariz. Rev. Stat. Ann. § 41–785(A), (C) (Supp. 1984–1985) (hearing within 30 days, decision within 30 days of hearing); Colo. Rev. Stat. § 24–50–125(4) (Supp. 1984) (hearing within 45 days, decision within 45 days of hearing); Conn. Gen. Stat. Ann. § 5–202(b) (Supp. 1984) (decision within 60 days of hearing);

viewed only as "directory" by Ohio courts, those courts have also made it clear that when the limit is exceeded, "[t]he burden of proof [is] placed on the [Commission] to illustrate to the court that the failure to comply with the 30-day requirement . . . was reasonable." *In re Bronkar*, 53 Ohio Misc. 13, 17, 372 N. E. 2d 1345, 1347 (Com. Pl. 1977). I cannot conclude on this record that Loudermill could prove "no set of facts" that might have entitled him to relief after nine months of waiting.

---

Ill. Rev. Stat., ch. 24½, ¶ 38b14 (1983) (hearing within 45 days); Ind. Code § 4–15–2–35 (1982) (decision within 30 days of hearing); Iowa Code § 19A.14 (1983) (hearing within 30 days); Kan. Stat. Ann. § 75–2949(f) (Supp. 1983) (hearing within 45 days); Ky. Rev. Stat. § 18A.095(3) (1984) (hearing within 60 days of filing, decision within 90 days of filing); Maine Rev. Stat. Ann., Tit. 5, § 753(5) (1979) (decision within 30 days of hearing); Md. Ann. Code, Art. 64A, §§ 33(b)(2), (e) (Supp. 1984) (salary suspension hearing within 5 days and decision within 5 more days; discharge hearing within 90 days and decision within 45 days of hearing); Mass. Gen. Laws Ann., ch. 31, § 43 (Supp. 1984–1985) (hearing within 10 days, findings "forthwith," decision within 30 days of findings); Minn. Stat. § 44.08 (1970) (hearing within 10 days, decision within 3 days of hearing); Nev. Rev. Stat. § 284.390(2) (1983) (hearing within 20 days); N. J. Stat. Ann. §§ 11:15–4, 11:15–6 (West 1976) (hearing within 30 days, decision within 15 days of hearing); Okla. Stat., Tit. 74, §§ 841.13, 841.13A (Supp. 1984) (hearing within 35 days, decision within 15 days of hearing); R. I. Gen. Laws §§ 36–4–40, 36–4–40.2, 36–4–41 (1984) (initial hearing within 14 days, interim decision within 20 days of hearing, appeal decision within 30 more days, final decision of Governor within 15 more days); S. C. Code §§ 8–17–330, 8–17–340 (Supp. 1984) (interim decision within 45 days of filing, final decision within 20 days of hearing); Utah Code Ann. § 67–19–25 (Supp. 1983) (interim decision within 5–20 days, final hearing within 30 days of filing final appeal, final decision within 40 days of hearing); Wash. Rev. Code § 41.64.100 (1983) (final decision within 90 days of filing); Wis. Stat. § 230.44(4)(f) (Supp. 1984–1985) (decision within 90 days of hearing); see also Ala. Code § 36–26–27(b) (Supp. 1984) (hearings on citizen removal petitions within 20 days of service); D. C. Code § 1–617.3(a)(1)(D) (1981) ("Career and Educational Services" employees "entitled" to decision within 45 days); Ga. Code Ann. § 45–20–9(e)(1) (1982) (hearing officer's decision required within 30 days of hearing); Miss. Code Ann. § 21–31–23 (Supp. 1984) (hearing required within 20 days of termination for "extraordinary circumstances").

The Court previously has recognized that constitutional restraints on the timing, no less than the form, of a hearing and decision "will depend on appropriate accommodation of the competing interests involved." *Goss* v. *Lopez*, 419 U. S. 565, 579 (1975). The relevant interests have generally been recognized as threefold: "the importance of the private interest and the length or finality of the deprivation, the likelihood of governmental error, and the magnitude of the governmental interests involved." *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422, 434 (1982) (citations omitted); accord, *Mathews* v. *Eldridge*, 424 U. S. 319, 334–335 (1976); cf. *United States* v. *$8,850*, 461 U. S. 555, 564 (1983) (four-factor test for evaluating constitutionality of delay between time of property seizure and initiation of forfeiture action). "Little can be said on when a delay becomes presumptively improper, for the determination necessarily depends on the facts of the particular case." *Id.*, at 565.

Thus the constitutional analysis of delay requires some development of the relevant factual context when a plaintiff alleges, as Loudermill has, that the administrative process has taken longer than some minimal amount of time. Indeed, all of our precedents that have considered administrative delays under the Due Process Clause, either explicitly or *sub silentio*, have been decided only after more complete proceedings in the District Courts. See, *e. g.*, *$8,850*, *supra; Barry* v. *Barchi*, 443 U. S. 55 (1979); *Arnett* v. *Kennedy*, 416 U. S. 134 (1974); *Mathews* v. *Eldridge*, *supra*.[4] Yet in Part V, the Court summarily holds Loudermill's allegations

---

[4] After giving careful consideration to well-developed factual contexts, the Court has reached results that might be viewed as inconsistent in the abstract. Compare *Barchi*, 443 U. S., at 66 (disapproving statute requiring decision within 30 days of hearing), with *Arnett*, 416 U. S., at 194 (WHITE, J., concurring in part and dissenting in part) (approving statutory scheme under which over 50 percent of discharge appeals "take more than three months"). Rather than inconsistency, however, these differing results demonstrate the impossibility of drawing firm lines and the importance of factual development in such cases.

insufficient, without adverting to any considered balancing of interests. Disposal of Loudermill's complaint without examining the competing interests involved marks an unexplained departure from the careful multifaceted analysis of the facts we consistently have employed in the past.

I previously have stated my view that

"[t]o be meaningful, an opportunity for a full hearing and determination must be afforded at least at a time when the potentially irreparable and substantial harm caused by a suspension can still be avoided—*i. e.,* either before or immediately after suspension." *Barry* v. *Barchi, supra,* at 74 (BRENNAN, J., concurring in part).

Loudermill's allegations of months-long administrative delay, taken together with the facially divergent results regarding length of administrative delay found in *Barchi* as compared to *Arnett,* see n. 4, *supra,* are sufficient in my mind to require further factual development. In no other way can the third *Mathews* factor—"the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement [in this case, a speedier hearing and decision] would entail," 424 U. S., at 335—sensibly be evaluated in this case.[5] I therefore would remand the delay issue to the District Court for further evidentiary proceedings consistent with the *Mathews* approach. I respectfully dissent from the Court's contrary decision in Part V.

---

[5] In light of the complete absence of record evidence, it is perhaps unsurprising that the Court of Appeals below was forced to speculate that "[t]he delays in the instant cases in all likelihood were inadvertent." 721 F. 2d, at 564, n. 19. Similarly, the Cleveland Board of Education and Civil Service Commission assert only that "[n]o authority is necessary to support the proposition" that administrative resolution of a case like Loudermill's in less than nine months is "almost impossible." Brief for Respondents in No. 83–6392, p. 8, n. 4. To the contrary, however, I believe our precedents clearly require demonstration of some "authority" in these circumstances.

JUSTICE REHNQUIST, dissenting.

In *Arnett* v. *Kennedy*, 416 U. S. 134 (1974), six Members of this Court agreed that a public employee could be dismissed for misconduct without a full hearing prior to termination. A plurality of Justices agreed that the employee was entitled to exactly what Congress gave him, and no more. THE CHIEF JUSTICE, Justice Stewart, and I said:

"Here appellee did have a statutory expectancy that he not be removed other than for 'such cause as will promote the efficiency of [the] service.' But the very section of the statute which granted him that right, a right which had previously existed only by virtue of administrative regulation, expressly provided also for the procedure by which 'cause' was to be determined, and expressly omitted the procedural guarantees which appellee insists are mandated by the Constitution. Only by bifurcating the very sentence of the Act of Congress which conferred upon appellee the right not to be removed save for cause could it be said that he had an expectancy of that substantive right without the procedural limitations which Congress attached to it. In the area of federal regulation of government employees, where in the absence of statutory limitation the governmental employer has had virtually uncontrolled latitude in decisions as to hiring and firing, *Cafeteria Workers* v. *McElroy*, 367 U. S. 886, 896–897 (1961), we do not believe that a statutory enactment such as the Lloyd-La Follette Act may be parsed as discretely as appellee urges. Congress was obviously intent on according a measure of statutory job security to governmental employees which they had not previously enjoyed, but was likewise intent on excluding more elaborate procedural requirements which it felt would make the operation of the new scheme unnecessarily burdensome in practice. Where the focus of legislation was thus strongly on the procedural mechanism for enforcing the substantive

right which was simultaneously conferred, we decline to conclude that the substantive right may be viewed wholly apart from the procedure provided for its enforcement. The employee's statutorily defined right is not a guarantee against removal without cause in the abstract, but such a guarantee as enforced by the procedures which Congress has designated for the determination of cause." *Id.*, at 151–152.

In these cases, the relevant Ohio statute provides in its first paragraph that

"[t]he tenure of every officer or employee in the classified service of the state and the counties, civil service townships, cities, city health districts, general health districts, and city school districts thereof, holding a position under this chapter of the Revised Code, shall be during good behavior and efficient service and no such officer or employee shall be reduced in pay or position, suspended, or removed, except . . . for incompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, violation of such sections or the rules of the director of administrative services or the commission, or any other failure of good behavior, or any other acts of misfeasance, malfeasance, or nonfeasance in office." Ohio Rev. Code Ann. § 124.34 (1984).

The very next paragraph of this section of the Ohio Revised Code provides that in the event of suspension of more than three days or removal the appointing authority shall furnish the employee with the stated reasons for his removal. The next paragraph provides that within 10 days following the receipt of such a statement, the employee may appeal in writing to the State Personnel Board of Review or the Commission, such appeal shall be heard within 30 days from the time of its filing, and the Board may affirm, disaffirm, or modify the judgment of the appointing authority.

Thus in one legislative breath Ohio has conferred upon civil service employees such as respondents in these cases a limited form of tenure during good behavior, and prescribed the procedures by which that tenure may be terminated. Here, as in *Arnett*, "[t]he employee's statutorily defined right is not a guarantee against removal without cause in the abstract, but such a guarantee as enforced by the procedures which [the Ohio Legislature] has designated for the determination of cause." 416 U. S., at 152 (opinion of REHNQUIST, J.). We stated in *Board of Regents* v. *Roth*, 408 U. S. 564, 577 (1972):

> "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

We ought to recognize the totality of the State's definition of the property right in question, and not merely seize upon one of several paragraphs in a unitary statute to proclaim that in that paragraph the State has inexorably conferred upon a civil service employee something which it is powerless under the United States Constitution to qualify in the next paragraph of the statute. This practice ignores our duty under *Roth* to rely on state law as the source of property interests for purposes of applying the Due Process Clause of the Fourteenth Amendment. While it does not impose a federal definition of property, the Court departs from the full breadth of the holding in *Roth* by its selective choice from among the sentences the Ohio Legislature chooses to use in establishing and qualifying a right.

Having concluded by this somewhat tortured reasoning that Ohio has created a property right in the respondents in these cases, the Court naturally proceeds to inquire what process is "due" before the respondents may be divested of

that right. This customary "balancing" inquiry conducted by the Court in these cases reaches a result that is quite unobjectionable, but it seems to me that it is devoid of any principles which will either instruct or endure. The balance is simply an ad hoc weighing which depends to a great extent upon how the Court subjectively views the underlying interests at stake. The results in previous cases and in these cases have been quite unpredictable. To paraphrase Justice Black, today's balancing act requires a "pretermination opportunity to respond" but there is nothing that indicates what tomorrow's will be. *Goldberg* v. *Kelly*, 397 U. S. 254, 276 (1970) (Black, J., dissenting). The results from today's balance certainly do not jibe with the result in *Goldberg* or *Mathews* v. *Eldridge*, 424 U. S. 319 (1976).* The lack of

---

*Today the balancing test requires a pretermination opportunity to respond. In *Goldberg* we required a full-fledged trial-type hearing, and in *Mathews* we declined to require any pretermination process other than those required by the statute. At times this balancing process may look as if it were undertaken with a thumb on the scale, depending upon the result the Court desired. For example, in *Mathews* we minimized the importance of the benefit to the recipient, stating that after termination he could always go on welfare to survive. 424 U. S., at 340–343; see also *id.*, at 350 (BRENNAN, J., dissenting). Today, however, the Court exalts the recipient's interest in retaining employment; not a word is said about going on welfare. Conversely, in *Mathews* we stressed the interests of the State, while today, in a footnote, the Court goes so far as to denigrate the State's interest in firing a school security guard who had lied about a prior felony conviction. *Ante*, at 545, n. 10.

Today the Court purports to describe the State's interest, *ante*, at 544–545, but does so in a way that is contrary to what petitioner Boards of Education have asserted in their briefs. The description of the State's interests looks more like a makeweight to support the Court's result. The decision whom to train and employ is strictly a decision for the State. The Court attempts to ameliorate its ruling by stating that a State may always suspend an employee with pay, in lieu of a predischarge hearing, if it determines that he poses a threat. *Ibid.* This does less than justice to the State's interest in its financial integrity and its interest in promptly terminating an employee who has violated the conditions of his tenure, and ignores Ohio's current practice of paying back wages to wrongfully discharged employees.

any principled standards in this area means that these procedural due process cases will recur time and again. Every different set of facts will present a new issue on what process was due and when. One way to avoid this subjective and varying interpretation of the Due Process Clause in cases such as these is to hold that one who avails himself of government entitlements accepts the grant of tenure along with its inherent limitations.

Because I believe that the Fourteenth Amendment of the United States Constitution does not support the conclusion that Ohio's effort to confer a limited form of tenure upon respondents resulted in the creation of a "property right" in their employment, I dissent.